ORIGINAL

Luis Sancho
PO Box 411
Honomu, HI 96728
808-964-5535
*pro se*



FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 21 2008

at 3 o'clock and 30 min
SUE BEITIA, CLERK

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

--ooOoo--

| | |
|---|---|
| LUIS SANCHO, WALTER L. WAGNER, ) | Civil No. CV08 00136 HG KSC |
| Plaintiffs ) | |
| ) | **COMPLAINT FOR TEMPORARY** |
| vs. ) | **RESTRAINING ORDER,** |
| ) | **PRELIMINARY INJUNCTION,** |
| US DEPARTMENT OF ENERGY, ) | **AND PERMANENT INJUNCTION** |
| FERMILAB, CENTER FOR NUCLEAR ) | |
| ENERGY RESEARCH (CERN), ) | |
| NATIONAL SCIENCE FOUNDATION, ) | |
| DOE ENTITIES 1-100, ) | |
| ) | |
| Defendants ) | |

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

COME NOW Plaintiffs LUIS SANCHO and WALTER L. WAGNER, and for causes of action allege as follows:

I

## JURISDICTIONAL ALLEGATIONS

1. At all times herein mentioned plaintiff Luis Sancho is a citizen of Spain, with legal residence in the United States and Hawaii.

2. At all times herein mentioned plaintiff Walter L. Wagner is a citizen of the State of Hawaii.

3. At all times herein mentioned defendant United States Department of Energy [hereinafter DOE] is a federal agency with operations in the State of Hawaii.

4. At all times herein mentioned defendant Fermilab is a federal laboratory with operations in Chicago, Illinois and Geneva, Switzerland at the LHC.

5. At all times herein mentioned defendant National Science Foundation [hereinafter NSF] is a federally chartered agency for distributing federal funds to recipients, including defendants herein.

6. At all times herein mentioned defendant Center for Nuclear Energy Research [hereinafter CERN] is a European agency with operations in Switzerland and France.

7. Plaintiffs are presently unaware of the names or locations of Doe Defendants 1-100.

II

## SUBSTANTIVE ALLEGATIONS *Re* LHC

8.  Defendants DOE, Fermilab, NSF and CERN, and Does 1-100 have engaged in a partnership relationship to construct a machine in and around Geneva Switzerland known as the Large Hadron Collider [hereinafter LHC]. The LHC machine is presently under construction and nearing completion, with completion anticipated in April, 2008.

9.  Defendants intend to test the LHC machine upon completion, with testing to commence within days of completion.

10. The purpose of the LHC machine is to create novel conditions of matter never previously existent on earth, so that defendants may seek to investigate the properties of this novel condition of matter for purposes of fundamental physics research.

11. The machine is scheduled to operate by colliding high-energy beams of protons [Hydrogen nuclei] or Lead nuclei into each other. The resultant collision of the two atoms traveling in opposite direction and then colliding head-on is designed to release a large amount of energy, and fracture the atoms into more fundamental particles, as well as create novel particles from the abundance of energy present.

12. Various competing theories of physics predict various outcomes from these collisions, with no agreement amongst physicists as to what the outcome will be.

13. In addition to fracturing the atoms into smaller, more fundamental particles, some of the competing theories predict that the outcome will be a rearrangement of the more fundamental particles, or creation *de novo* from the

abundance of energy present, or both, into novel forms, which include the following descriptive particles from those theories:

    a)    *Strangelets*: Under this theory, the original constituents of the atom ["up" quarks and "down" quarks] will recombine with newly created "strange" quarks to form a new, more stable form of matter called a "strangelet". Its enhanced stability compared to normal matter would allow it to fuse with normal matter, converting the normal matter into an even larger strangelet. Repeated fusions would result in a runaway fusion reaction, eventually converting all of Earth into a single large "strangelet" of huge size.

    b)    *Micro Black Holes*: Under this theory, the compression of the two atoms colliding together at nearly light speed will cause an irreversible *implosion*, forming a miniature version of a giant black hole, the remnant of a collapsed star. Like its much larger cousin, a miniature black hole would not emit light, and any matter coming into contact with it would fall into it and never be able to escape. Eventually, all of earth would fall into such growing micro-black-hole, converting earth into a medium-sized black hole, around which would continue to orbit the moon, satellites, the ISS, *etc.*

    c)    *Magnetic Monopoles*: Under this theory, the high energy of the collision would be converted into two massive particles known as north and south magnetic monopoles. Each would carry a fundamental unit of magnetic charge. Such particle might have the ability to catalyze the decay of protons and atoms, causing them to convert into other types of matter in a runaway reaction.

    14.    The above theories, and other theories showing potential adverse consequences, have been well articulated in various scientific publications. No absolute refutation of the adverse scenarios that have been described has yet been articulated,

though efforts have been made, and it has been suggested by defendants that the 'risk' of the adverse scenarios is small. Those efforts were perfunctory "safety reviews" which purported to prove the falsity of the adverse scenarios by indirect means. However, fundamental flaws were existent in those "safety reviews" and pointed out to defendants by plaintiffs. As a result, another "safety review" is currently underway by the defendants. The current safety review is known as the *LHC Safety Assessment Group [LSAG] Safety Review.* It was initially scheduled for completion by January 1, 2008, but defendants have delayed its release, and it has not yet been released to the public for review by the science community at large, as promised [see Exhibit "A" of affidavit of Walter L. Wagner].

15.   Plaintiffs and their associates are experts in physics and other fields of science, technology and ethics who are capable of reviewing and analyzing such safety reviews for flaws or errors. Plaintiffs and some of their associates have filed in support of this complaint various affidavits detailing some of the safety flaws and ethical flaws in safety review currently evidenced. Plaintiffs and their associates require a minimum of four to six months time to review the *LSAG Safety Review*, as well as the relevant scientific literature, in order to determine whether defendants' most recent pending *LSAG Safety Review* is once again fundamentally flawed, or satisfactory in addressing the safety issues in accordance with generally accepted standards in science, technology and industry.

III

## NEPA VIOLATIONS, ETC.

16. Defendants are obligated under the *National Environmental Policy Act* [hereinafter NEPA] to include either an "Environmental Assessment" [EA] if there is a "finding of no significant impact" [FONSI], or a full "Environmental Impact Statement" [EIS] if there is no FONSI, and to <u>do so in a timely manner</u> so impacted parties have a meaningful opportunity to respond.

17. NEPA is essentially a procedural statute, and a federal agency's actions under NEPA are generally reviewed to determine if the agency observed the appropriate procedural requirements. *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 399 (9th Cir. 1988) (citing 5 U.S.C. S 706(2)(D)). Substantive NEPA decisions by the agency are reviewed under the arbitrary and capricious standard. See *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376-377 (1989) (whether the agency needs to conduct an EIS is reviewed under arbitrary and capricious standard). Under the arbitrary and capricious standard, courts will overturn an agency's decision if the agency committed a "clear error of judgment." *California Trout v. Schaefer*, 58 F.3d 469, 473 (9th Cir. 1995).

18. Defendants failed to comply with NEPA because it did not give, let alone timely give, the plaintiffs or other members of the public either: (1) a FONSI for the LHC project; (2) an EIS for the LHC project, (3) a FONSI EA for the LHC project, or (4) the pending *LSAG Safety Review*, which if considered to be either a FONSI EA or an EIS, has not been timely prepared in advance of anticipated start-up of LHC operations so as

to give the plaintiffs meaningful opportunity to respond, and seek court intervention if necessary.

19. NEPA procedures are set forth in the Council on Environmental Quality ("CEQ") regulations. These procedures are designed to "[e]ncourage and facilitate public involvement" in projects which affect the environment. 40 C.F.R.S 1500.2(d) The procedures for public notice are set forth in 40 C.F.R. S 1506.6 which provides in pertinent part that:

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA related hearings, public meetings and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it . . . .

(2) In the case of an action <u>with effects of national concern</u> notice shall include <u>publication in the Federal Register and notice by mail to national organizations reasonably expected to be interested in the matter</u> .

. . .

(3) In the case of an action with effects primarily of local concern, the notice may include:

7

(i) Notice to State and area-wide clearinghouses . . . .

\*\*\*

(iv) Publication in local newspapers . . . .

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations . . . .

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property . . . .

[40 C.F.R. S 1506.6.]

20. The defendants' LHC project contains both national and local components. For matters of national concern, the CEQ regulations mandate notice in the Federal Register and mailed notice to interested national organizations. 40 C.F.R. S 1506.6(b)(2) The defendants failed to provide notice in the Federal Register, and failed to mail notice to interested national organizations including plaintiffs.

21. The CEQ regulations mandate public notice in matters of local concern, though they do not mandate any particular form of notice. 40 C.F.R. S 1506.6(b) The methods of notice listed in 40 C.F.R. S 1506.6(b)(3) are merely permissive. However, the defendants failed to provide any form of notice, and the late-issued, still-pending

*LSAG Safety Review* is utterly untimely, and does not comport to EIS or FONSI EA requirements.

22.    Defendants' decisions not to prepare an EIS or a FONSI was arbitrary and capricious. Though NEPA does not require an agency to prepare site-specific environmental impact studies for each potential location of adverse impact[1], the purpose of the environmental assessment is to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. S 1508.9. This purpose has been thwarted by the arbitrary and capricious actions of defendants.

IV

Defendants Fail to Abide by European Council's *Precautionary Principle*

23.    In addition to defendants failures to adhere to NEPA requirements, detailed *supra*, defendants have also failed to adhere to the requirements of the European Council's *Precautionary Principle* adopted in support of the *World Trade Organization* [WTO].

24.    Additionally, the defendant's have failed to adhere to the *European Commission*'s "Science and Society Action Plan", which states in its *Risk Governance* section:

> "The Commission has also set out its approach to the use of the *Precautionary Principle*, suggesting guidelines for risk management when

---

[1] See *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989) ("[I]f an agency is unsure whether a proposed project requires [a] . . . supplemental EIS, federal regulations direct the agency to prepare an environmental assessment on which it may then base its decision"); *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1421-22 (9th Cir. 1989) (citing 40 C.F.R. S 1501.4(b)-(c))

9

faced with scientific uncertainty, and stating general principles always to be applied in risk management."

25.  The <u>prime risk</u> is derived from the fact that there is a <u>lack of an ethical governance institution</u> for, and indeed, independent government regulation of, the LHC risk.

V

PRAYER FOR RELIEF

26.  There is no question that should defendants inadvertently create a dangerous form of matter such as a micro black hole or a strangelet, or otherwise create unsafe conditions of physics, then the environmental impact would be both local and national in scope, and quite deadly to everyone.

24.  Accordingly, defendants are obligated under NEPA, etc., to provide plaintiffs with either an EIS, or a FONSI EA, addressing the safety issues that are and have been known to defendants for several years. Additionally, plaintiffs are to be afforded a reasonable amount of time in which to respond appropriately to either the EIS or FONSI EA, before defendants would be allowed to operate their LHC.

25.  Because plaintiffs have been required to spend an inordinate amount of time and resources in defending against defendants' failures to properly address the issues raised by plaintiffs and others, they should be awarded their costs of preparing for suit, as well as attorney's fees and litigation costs after filing of suit.

26.  WHEREFORE, it is respectfully requested as follows:

    a)    A temporary restraining order be issued restraining defendants from operating the LHC or further preparing the LHC for operation for four months;

    b)    A preliminary injunction enjoining defendants from operating the LHC until after they have completed either a FONSI or EIS, as appropriate, be issued and to last until such time that such FONSI or EIS has been reviewed by plaintiffs or the court and approved for operation;

    c)    A permanent injunction be issued enjoining defendants from operating the LHC until such time that the LHC can be proven to be reasonably safe within industry standards; and

    d)    For costs of suit, attorney's fees, and such other relief as the Court deems just and proper.

DATED: March 14, 2008

_____  
Luis Sancho

_____  
Walter L. Wagner