EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawaii
DERRICK K. WATSON (Cal. Bar No. 154427)
Assistant United States Attorney
District of Hawaii

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
ANDREW A. SMITH (NM Bar #8341)
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
c/o U.S. Attorneys Office
P.O. Box 607
Albuquerque, New Mexico 87103
Telephone:  (505) 224-1468
Facsimile:  (505) 346-7205
E-mail:  andrew.smith@usdoj.gov

Attorneys for Federal Defendants
U.S. DEPARTMENT OF ENERGY
and NATIONAL SCIENCE FOUNDATION

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| LUIS SANCHO and<br>WALTER L. WAGNER,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>OF ENERGY, *et al.*,<br><br>Defendants.<br>_____ | ) Civil No. 08-00136-HG-KSC<br>)<br>) **FEDERAL DEFENDANTS'**<br>) **RESPONSE IN OPPOSITION TO**<br>) **PLAINTIFFS' AUGUST 5, 2008**<br>) **MOTION FOR A DEFAULT**<br>) **JUDGMENT AND PERMANENT**<br>) **INJUNCTION AGAINST CERN [DKT.**<br>) **NO. 29]**<br>)<br>) DATE:  September 25, 2008<br>) TIME:  9:30 a.m.<br>) The Honorable Kevin S.C. Chang |

## TABLE OF CONTENTS

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.   **PLAINTIFFS WERE NOT ENTITLED TO THE ENTRY OF A DEFAULT AGAINST CERN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.  **A DEFAULT JUDGMENT AGAINST CERN IS NOT APPROPRIATE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.   **This Court Lacks Jurisdiction, And Therefore Should Dismiss Plaintiffs' Claims And Deny Plaintiffs' Motion For A Default Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.   **A Default Judgment Against CERN Is Not Appropriate Because Plaintiffs' NEPA Claims Are Inextricably Linked To Federal Defendants** . . . . . . . . . . . . . . . 19

    C.   **The Factors For Awarding A Default Judgment Weigh Heavily Against Plaintiffs In This Case** . . . . . . . . . . . . . . 22

III. **PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE COURT SHOULD ISSUE A PERMANENT INJUNCTION AGAINST CERN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.   **Any Claim For Injunctive Relief In This Case Is Barred By Application Of The Doctrine Of Laches** . . . . . . . . . . 24

    B.   **Plaintiffs Cannot Demonstrate Irreparable Injury Because They Have Not Produced Any Credible Evidence Or Expert Opinions Supporting Their Doomsday Scenario** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.      The Balance Of Harms And Public Interest Weigh
        Against An Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# TABLE OF AUTHORITIES

## FEDERAL CASES

American-Arab Anti-Discrimination Comm. v. Reno,
    70 F.3d 1045 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Amoco Production Co. v. Village of Gambell,
    480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Apache Survival Coalition v. United States,
    21 F.3d 895 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Big Country Foods, Inc. v. Board of Educ. of Anchorage Sch. Dist.,
    868 F.2d 1085 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

Chemical Weapons Working Group, Inc. v. U.S. Dept. of the Army,
    963 F. Supp. 1083 (D. Utah 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Crowther v. Seaborg,
    415 F.2d 437 (10th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Daubert v. Merrell Dow Pharm., Inc.,
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Eitel v. McCool,
    782 F.2d 1470 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Falk v. Allen,
    739 F.2d 461 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Forschner Group, Inc. v. B-Line A.G.,
    943 F. Supp. 287 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Friends of Southeast's Future v. Morrison,
    153 F.3d 1059 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Frow v. De La Vega,
    82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872) . . . . . . . . . . . . . . . . . . . . . . . . 19

Goldie's Bookstore, Inc. v. Superior Court,
    739 F.2d 466 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc.,
    740 F.2d 1499 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Half Moon Bay Fisherman's Marketing Assn. v. Carlucci,
    857 F.2d 505 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Heary Bros. Lightning Protection Co. v. Lightning Protection Institute,
    287 F. Supp. 2d 1038 (D. Az. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re: First T.D. & Investment, Inc.,
    253 F.3d 520 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

In re Tuli,
    172 F.3d 707 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kokkonen v. Guardian Life Ins. Co. of America,
    511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Mason v. Genisco Technology Corp.,
    960 F.2d 849 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency & Office of
Emergency Preparedness,
    649 F.2d 71 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Matter of Extradition of Heilbronn,
    773 F. Supp. 1576 (W.D. Mich. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mendoza v. Wight Vineyard Mgmt.,
    783 F.3d 941 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Neighbors of Cuddy Mountain v. U.S. Forest Service</u>,
       137 F.3d 1372 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

<u>Northern Cheyenne Tribe v. Hodel</u>,
       851 F.2d 1152 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries</u>,
       353 F.3d 916 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Ruhrgas AG v. Marathon Oil Co.</u>,
       526 U.S. 574 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.</u>,
       127 S.Ct. 1184 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

<u>Steel Co. v. Citizens for a Better Environment</u>,
       523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Thompson v. McCombe</u>,
       99 F.3d 352 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>United States v. One 1988 Chevrolet Half-Ton Pickup Truck</u>,
       357 F. Supp. 2d 1321 (S.D. Ala. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Volkswagenwerk Aktiengesellschaft v. Schlunk</u>,
       486 U.S. 694 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Weinberger v. Romero-Barcelo</u>,
       456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 35

## **<u>FEDERAL STATUTES</u>**

National Environmental Policy Act

       42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## **FEDERAL RULES**

Federal Rule of Civil Procedure 4(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Federal Rule of Civil Procedure 12(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Federal Rule of Civil Procedure 55(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Federal Rule of Civil Procedure 55(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Federal Rule of Civil Procedure 55(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Federal Rule of Civil Procedure 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Federal Rule of Evidence 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Federal Defendants United States Department of Energy ("DOE") and the

National Science Foundation ("NSF") hereby respond in opposition to Plaintiffs'

August 5, 2008 "Motion for Permanent Injunction Against Defaulting Defendant

CERN" (which also seeks entry of a default judgment against CERN), Dkt. No. 29,

and "Memorandum of Law in Support of Permanent Injunction" (hereinafter "Pls.

Mem."), Dkt. No. 31 as follows:

## INTRODUCTION

In this litigation, *pro se* Plaintiffs allege that the above-named Federal

Defendants, and what Plaintiffs identify as Defendant "Center for Nuclear Energy

Research" or "CERN," have violated the National Environmental Policy Act

("NEPA") by failing to prepare an adequate analysis of the risks of several

hypothetical objects that Plaintiffs allege could be produced by the Large Hadron

Collider ("LHC," or "Collider"), a subatomic particle accelerator on the Franco-

Swiss border near Geneva, Switzerland.  <u>See generally</u> Complaint Dkt. No. 1.[1]  On

September 2, 2008, this Court dismissed for lack of jurisdiction Plaintiffs' claims

that Defendants had violated the European Council's "Precautionary Principle" and

the European Commission's "Science and Society Action Plan" in regulating the risk

---

[1] "CERN" is actually the European Organization for Nuclear Research, which is
known by an acronym of its former name, Conseil Européen pour la Recherche
Nucléaire (European Council for Nuclear Research).

- 1 -

posed by the LHC, and the Court took under advisement Federal Defendants'

motions to dismiss and for summary judgment on the remainder of Plaintiffs' claims.

See Dkt. No. 68.

On July 1, 2008, Plaintiffs obtained from the Clerk of the Court an "Entry Of

Default Against Defendant CERN [Center for Nuclear Energy Research]," Dkt. No.

26.  Plaintiffs obtained this entry of default based on the July 1, 2008 "Declaration

of Walter L. Wagner In Support Of Entry Of Default Against Defendant CERN

[Center for Nuclear Energy Research]," Dkt. No. 25.  In this declaration, Plaintiff

Wagner asserted that "a copy of the Complaint and its accompanying Summons was

served on Defendant CERN [Center for Nuclear Energy Research] on May 28,

2008." Id. ¶ 3.  Mr. Wagner based this assertion on a June 4, 2008 letter by a Mr.

Marco Breitenmoser, a letter written in French, and for which Mr. Wagner failed to

provide the Court with any certified translation into English.  See Dkt. No. 22,

Exh. A.  Based on the Clerk's entry of a default, Plaintiffs now request the entry of a

default judgment and permanent injunction against CERN.

Plaintiffs' request is without basis in law or fact, and should be rejected.

Plaintiffs have not provided the Court with evidence or a legal basis for determining

that CERN, an international organization made up of 20 European member states,

was properly served in accordance with international legal requirements, and other

evidence before the Court indicates that CERN was not properly served.  Therefore, Plaintiffs were not entitled to the entry of a default against CERN, and without the entry of a default Plaintiffs cannot obtain a default judgment.

Even if the entry of a default was appropriate, Plaintiffs cannot obtain a default judgment against CERN because Plaintiffs have not established this Court's jurisdiction over CERN, this Court lacks jurisdiction over this case as a whole, Plaintiffs have no legal basis for bringing NEPA claims against CERN, there is no cognizable basis for any claim against CERN absent a judgment against Federal Defendants, and a default judgment against CERN would be prejudicial to Federal Defendants.

In addition to failing to establish that this Court should enter a default judgment against CERN, Plaintiffs have not, and cannot establish the requirements for injunctive relief.  Any claim for injunctive relief is barred by laches.  Moreover, Plaintiffs have not met their burden of demonstrating that they will be irreparably injured if an injunction does not issue, that the balance of harms favors an injunction, or that an injunction is in the public interest.  Instead, Plaintiffs raise only unfounded and incredibly speculative doomsday scenarios that are not supported by the scientific evidence but only on Plaintiffs' "expert" opinions that they are not qualified to give.  In contrast, if an injunction were to issue and actually were to halt

operation of the $500-billion LHC, the United States and the world would lose out on valuable nuclear research concerning the nature of energy and matter and the origins of the Universe, and the United States alone would lose $10 million per month in monies dedicated for LHC research.

For any or all of these reasons, the Court should deny Plaintiffs' Motion for a Default Judgment and Injunction against CERN.

## BACKGROUND

The LHC is a particle accelerator straddling the French-Swiss border.  June 24, 2008 Declaration of Bruce Strauss ("Strauss Decl."), Dkt. No. 20 ¶ 6.  The Collider consists of a ring--approximately 27 kilometers (about 17 miles) in circumference--of superconducting magnets and particle accelerating structures, located 100 meters (about 330 feet) underground.  Id.  The Collider is designed to accelerate proton particles nearly to the speed of light and collide them at the center of four large detectors designed to passively observe these collisions.  Id. ¶ 7.

The Collider is the product of more than a decade of planning and collaboration headed by CERN.  See June 24, 2008 Strauss Decl. ¶ 6.  CERN was established by convention in 1954 and consists of 20 European member states, each represented in CERN's governing council.  Id. ¶ 5; id. Attch. 7.  In December 1997, the United States--through DOE and NSF--entered into an international cooperation

- 4 -

agreement with CERN ("1997 Agreement") that outlined the parties' respective responsibilities for scientific and technical cooperation in the construction of the Collider and the subsequent research that would occur once the Collider was built. Id.. ¶ 8; id. Attch. 4.  The United States is not a member of CERN.  Id. ¶ 12; id. Attch. 7 (listing member states).  CERN has sole responsibility for operating and maintaining the Collider.  Id. ¶ 13; id. Attch. 4 at 6 § (10.4).

The 1997 Agreement provided that the United States would assist in construction of some superconducting magnets for the Collider.  See June 24, 2008 Strauss Decl., Attch. 4 at 3-4 (Article III).  This resulted in the United States providing assistance in the construction of 38 of more than 1800 superconducting magnets to be placed in the accelerator.  Id. ¶ 20.  The 1997 Agreement also provided that the United States would participate in the construction of two detectors, known as the Compact Muon Solenoid ("CMS") and A Toroidal LHC Apparatus ("ATLAS") detectors (collectively, "Detectors").  Id. ¶ 20; id. Attch. 4 at 4 (§ 3.2).  The United States also will participate in experiments involving the Detectors.  Id. ¶¶ 24, 25; id. Attch. 4 at 4 (§ 3.2).  The 1997 Agreement also gave the United States a non-voting "observer" status in CERN's council.  Id. ¶ 12; id. Attch. 4 at 3 (§ 1.9), 5 (§ 7.1).

Pursuant to the 1997 Agreement, DOE and NSF contributed a total of $531

million toward construction of the Collider and Detectors, which is less than 10 percent of the total construction costs.  June 24, 2008 Strauss Decl. ¶¶ 14, 21, 22; June 24, 2008 Declaration of Morris Pripstein ("Pripstein Decl."), Dkt. No. 19 ¶ 7.[2] NSF, which contributed a total of $81 million to construction of the Detectors, expended such funds by entering into cooperative agreements in 1999 with Northeastern and Columbia Universities.  Pripstein Decl. ¶¶ 9(a), 9(b) & Attchs. B, C.  All of the funds under the cooperative agreements were disbursed and spent prior to this lawsuit.  Id. ¶¶ 9(a), 9(b).

DOE, which contributed a total of $450 million toward construction costs, began funding construction of the Collider and its Detectors in 1998.  June 24, 2008 Strauss Decl. ¶ 18.  From 1998 through 2005, DOE spent $200 million on the construction of the accelerator components.  Id.  From 1998 through 2007, DOE spent $250 million on construction of the Detectors.  Id.; id. Attch. 9.  DOE made these expenditures by providing funding to several of its national laboratories for construction, pre-installation testing, and delivery of LHC accelerator components, and for assistance to CERN with Detector installation and verification testing.  Id. ¶

---

[2] DOE's total contribution to construction was $450 million (Strauss Decl. ¶¶ 14, 21), while NSF contributed $81 million (Pripstein Decl. ¶ 7), for a total of $531 million contributed by the United States toward construction.  The total cost of constructing the LHC, excluding labor costs, is roughly $5.84 billion.  Strauss Decl. ¶ 21 (stating cost in Swiss Francs, based upon one-to-one U.S. dollar equivalence).

19.  All such DOE contributions to construction (totaling $450 million) were disbursed and spent prior to this lawsuit.  Id. ¶¶ 21-22.

The United States' contributions to the construction of the Detectors and the accelerator components have been completed.  June 24, 2008 Pripstein Decl. ¶ 7; June 24, 2008 Strauss Decl. ¶ 22.  The Detectors are located in Geneva, Switzerland, and are under the control of CERN.  Pripstein Decl. ¶ 7.  The accelerator components were physically delivered to CERN in Switzerland by March 2007.  Strauss Decl. ¶ 22.  In addition, the United States transferred title of the accelerator components to CERN in September 2007.  Id.  DOE's contributions to construction of the Detectors were entirely disbursed by June 2007 (id.), and NSF's contributions were disbursed by the end of fiscal year 2003.  Pripstein Decl. ¶¶ 9(a), 9(b).  The construction and operation of the Collider abroad by foreign governments was the subject of safety analyses by CERN that were accepted by the host state authorities in France and Switzerland.  June 24, 2008 Declaration of Dennis Kovar, Dkt. No. 17 Attch. A.

In addition to providing support for construction of some of the components of the Collider, Federal Defendants also provided support for research experiments at the Collider.  For example, in 2007 NSF decided to contribute $87 million to the operation and maintenance of the Detectors for five years.  June 24, 2008 Pripstein

Decl. ¶¶ 10(a), 10(b); id., Attachs. D, E (cooperative agreements).  Likewise, DOE will provide support for research scientists participating in experiments with the Detectors.  June 24, 2008 Strauss Decl. ¶¶ 24, 25.  Approximately 3,930 scientists from both the United States and other countries are expected to participate in research involving the Detectors.  Id. ¶ 25 (Table 2).  In total, Federal Defendants will be providing financial support for approximately 20 percent of the research positions at ATLAS, and 34 percent at CMS.  Pripstein Decl. ¶ 11.

In preparation for operations, CERN has begun cooling the Collider to just about a couple degrees above absolute zero.  Strauss Decl., Attach. 17.  After the whole Collider is cooled, electrical testing will be concluded in readiness for the first beams.  Id.

## ARGUMENT

## I.    PLAINTIFFS WERE NOT ENTITLED TO THE ENTRY OF A DEFAULT AGAINST CERN

Pursuant to Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  After a clerk enters a default, "[t]he court may set aside an entry of default for good cause."  Id. 55(c).  "Where timely relief is

sought from a default . . . and the movant has a meritorious defense, doubt, if any,

should be resolved in favor of the motion to set aside the default so that cases may

be decided on their merits." Mendoza v. Wight Vineyard Mgmt., 783 F.3d 941,

945-46 (9th Cir. 1986) (quotations and modifications omitted).

Here, the Clerk of the Court issued an "Entry Of Default Against Defendant

CERN [Center for Nuclear Energy Research]," on July 1, 2008.  Dkt. No. 26.  The

Clerk entered this default against CERN on a form entry of default submitted by Mr.

Wagner based on the July 1, 2008 "Declaration of Walter L. Wagner In Support Of

Entry Of Default Against Defendant CERN [Center for Nuclear Energy Research],"

Dkt. No. 25.  Because there was no evidence that CERN had been properly served

and then had actually failed to respond to Plaintiffs' Complaint in a timely manner,

the entry of default was not appropriate and should be set aside.

In his July 1, 2008 declaration, Mr. Wagner states that "a copy of the

Complaint and its accompanying Summons was served on Defendant CERN

[Center for Nuclear Energy Research] on May 28, 2008, as is more fully set forth in

the Certificate of Service signed by Walter L. Wagner on June 27, 2008 and Marco

Breitenmoser on June 4, 2008 and filed herein on June 30, 2008." Id. ¶ 3.  Mr.

Breitenmoser's June 4, 2008 letter, which appears on the Court's docket as

Exhibit A to both Docket Number 22 and Docket Number 23, however, is not in

English, but in French.  See Exh. A, Dkt. No. 22; Exh. A, Dkt. No. 23.  The

accompanying "Record of Service" is also written in French.  See Exh. B, Dkt. No.

22; Exh. B, Dkt. No. 23.

There was no certified translation of Mr. Breitenmoser's June 4, 2008 letter in

the Record before the Clerk, only Mr. Wagner's claim in his unsworn Certificate of

Service as to the contents of the letter, and Mr. Wagner does not claim to be a

court-certified translator of French-English.  See Dkt. Nos. 22 and 23.  Heary Bros.

Lightning Protection Co. v. Lightning Protection Institute, 287 F. Supp. 2d 1038,

1074 (D. Az. 2003) (sua sponte striking as inadmissible exhibits that were not in

English and for which plaintiff had provided no translation); United States v. One

1988 Chevrolet Half-Ton Pickup Truck, 357 F. Supp. 2d 1321, 1329 (S.D. Ala.

2005) (excluding foreign-language exhibit that the plaintiff had failed to submit with

a certified translation into English).  In the absence of any certified translations of

the key documents on which Mr. Wagner's request for a default was based, the

Clerk erred in approving Mr. Wagner's form for entry of a default against CERN.

The entry of a default against CERN should also be set aside because there is

no evidence that CERN was properly served.  Federal Defendants have submitted

herewith English translations of the documents that Mr. Wagner provided the Clerk

in asserting that CERN had been served, as well as another document from Mr.

- 10 -

Wagner's Swiss process server Mr. Breitenmoser that Mr. Wagner has not provided

the Court.  <u>See</u> Declaration of Stanley F. Miller (Miller Decl.), and exhibits thereto.

Translated to English, Mr. Breitenmoser's June 4, 2008 letter states that he

hand-delivered the "Record of Service" to "Mrs. Lucie Barbin at the Legal

Department of the CERN on May 28, 2007."  Miller Decl., Exh. B.  The

accompanying "Record of Service," translated to English, indicates the same.  Id.

Exh. F.

Delivering legal papers from a United States federal court to the legal

department of CERN in Switzerland does not constitute effective service on CERN.

CERN is an international organization made up of 20 foreign (European) Member

States, and is headquartered in Geneva, Switzerland.  June 24, 2008 Strauss Decl.

¶ 5.  Pursuant to Federal Rule of Civil Procedure 4(f), an entity in a foreign state

"may be served at a place not within any judicial district of the United States . . . by

any internationally agreed means of service that is reasonably calculated to give

notice, such as those authorized by the Hague Convention on the Service Abroad of

Judicial and Extrajudicial Documents."  Fed. R. Civ. P. 4(f).  Both the United States

and Switzerland are members of the Hague Convention on the Service Abroad of

Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague

Convention").  T.I.A.S. No. 6638, 20 U.S.T. 361, 1969 WL 97765 (Nov. 15, 1965).

Service in compliance with the Hague Convention is "mandatory" and "pre-empts inconsistent methods of service prescribed by state law in all cases to which it applies." Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988).[3]

The Hague Convention does not allow a party to effectuate service from the United States on an international organization headquartered in Switzerland by dropping pleadings off at that organization's legal offices in Geneva. As the Swiss Embassy has advised this Court, "the delivery of official court documents to an intergovernmental organization through a bailiff, an attorney or the court itself violates international law and, in particular, the Agreement between Switzerland and the European Organization for Nuclear Research Concerning the Legal Status of the European Organization for Nuclear Research in Switzerland, which sets down the inviolability of the buildings of the Organization and the immunity from legal process." Dkt. No. 39 or 58. This letter goes on to explain how service must be made beginning with the United States Embassy in Bern, Switzerland. Id. Mr. Wagner's own process server Mr. Breitenmoser has advised Mr. Wagner that CERN

---

[3] See Forschner Group, Inc. v. B-Line A.G., 943 F. Supp. 287, 288 n.1 (S.D.N.Y. 1996) (noting that compliance with Federal Rule of Civil Procedure 4(f) and the Hague Convention was required to properly serve foreign corporation in Switzerland).

has not been properly served and his May 28, 2008 service was ineffective:

> The CERN has not accepted said Service because of the Headquarters
> Agreement signed with the Swiss Federal Council dated June 11, 1955
> that stipulates that the CERN shall enjoy the immunities and privileges
> usually granted to international organizations to the extent required for
> the fulfillment of their tasks.
>
> With respect to International Organizations, all judicial documents
> must be notified through the Swiss Mission, which is the diplomatic
> channel and therefore the adequate channel by which to notify judicial
> documents.

Miller Decl., Exh. D (translating Exhibit C into English).

In addition to using the wrong channels for service, Plaintiffs' attempted

service was deficient in other ways.  For instance, Switzerland requires that where,

as here, an entity does not accept service, service of legal documents must be made

in the language of the canton (region) in which the entity is located.  See Hague

Convention:  Information for Both Service and Evidence Abroad, United States

Embassy, Bern, Switzerland, http://bern.usembassy.gov/hague_convention.html (last

visited September 5, 2008) ("In their accession to the convention, the Swiss

specified that in cases where the addressee does not voluntarily accept service of a

document it cannot officially be served on him/her unless it is in the language of the

authority addressed.").  The official languages of Switzerland are German, French,

and Italian, not English.  See, e.g., id.; Miller Decl.¶ 6 ("Switzerland has four

- 13 -

official languages, including German and French.  English is not one of the official languages of Switzerland."); Matter of Extradition of Heilbronn, 773 F. Supp. 1576, 1581 (W.D. Mich. 1991) (stating that English is not one of the four official languages of Switzerland).  In violation of this requirement, the copies of the Summons and Complaint that Plaintiffs indicate they delivered to CERN's legal office are in English only.  Dkt. No. 23, Exh. B (Dkt. pp. 3-14).[4]

CERN plainly was not properly served, if it can be served at all.  Because the Entry of Default is not based on proper service on an international organization located in Switzerland, the Court should set aside the Clerk's July 1, 2008 "Entry Of Default Against Defendant CERN [Center for Nuclear Energy Research]."  Dkt. No. 26.[5]

---

[4] Both the Summons and Complaint, as well as the Entry of Default, incorrectly identify CERN as "Center for Nuclear Energy Research."  See Dkt. No. 23, Exh. B (Dkt. pp. 3, 4); Dkt. No. 26.  The Center for Nuclear Energy Research is actually "a non-profit research and corrosion monitoring company located at the University of New Brunswick" in Canada.  See http://www.unb.ca/cner/ (last visited Sept. 5, 2008).

[5] See Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries, 353 F.3d 916, 928 (11th Cir. 2003) (affirming dismissal of claims against international organization based on insufficient process, where plaintiff failed to comply with foreign state's requirements for serving international organization from abroad).

## II.    A DEFAULT JUDGMENT AGAINST CERN IS NOT APPROPRIATE

Following a defendant's default, Federal Rule of Civil Procedure 55(b)(2)

permits a court, in its discretion, to enter a final judgment against the defaulting

party.  Because Plaintiffs failed to properly serve CERN, the July 1, 2008 Entry of

Default by the Clerk is not appropriate and should be set aside.  In turn, once the

default against CERN is set aside, there is no predicate for Plaintiffs' request for a

default judgment and it must be denied.  See also Mason v. Genisco Technology

Corp., 960 F.2d 849, 854 (9th Cir. 1992) (holding that a default judgment was void

because ineffective service resulted in a lack of personal jurisdiction).

Even if there were a proper default against CERN in effect, however, granting

a default judgment against CERN would not be appropriate in this case.  Plaintiffs

have not established that this Court has jurisdiction over this case, CERN, or

Plaintiffs' NEPA claims against CERN.  And, even if this Court did have

jurisdiction, a default judgment against CERN would not be appropriate under the

circumstances of this case.

### A.    This Court Lacks Jurisdiction, And Therefore Should Dismiss Plaintiffs' Claims And Deny Plaintiffs' Motion For A Default Judgment

Prior to entering a default judgment against a party, the Ninth Circuit has

admonished that a district court must ensure that it has jurisdiction over that party

- 15 -

and the claims against that party.

> [W]hen a court is considering whether to enter a default judgment, it may dismiss an action *sua sponte* for lack of personal jurisdiction. * * * When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties. A judgment entered without personal jurisdiction over the parties is void. To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place.

In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999).

As the "part[ies] invoking the federal court's jurisdiction," Plaintiffs bear the burden of proving jurisdiction. Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996). Plaintiffs have provided no factual or legal argument demonstrating that this Court has jurisdiction over CERN, or over claims alleging that CERN has violated the National Environmental Policy Act ("NEPA").[6]

Federal courts are courts of limited jurisdiction. Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994). Federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree . . . [and i]t is to be presumed that a cause lies outside this limited jurisdiction." Id.

---

[6] As noted above, this Court dismissed Plaintiffs' European "law" claims for lack of jurisdiction, see Dkt. No. 68, thereby leaving only Plaintiffs' NEPA claims pending in this case.

Plaintiffs have failed to identify any provision of the Constitution or any federal statute that would allow this Court to exercise jurisdiction over an international organization representing 20 foreign states for the purpose of issuing declaratory and injunctive relief for an alleged violation of a domestic law, NEPA, for an action ("the LHC Project") occurring solely in two foreign countries. Plaintiffs' Complaint does not identify a single jurisdictional statute, let alone one that would encompass CERN and its activities in France and Switzerland.  Plaintiffs' motion for default judgment and memorandum in support are similarly devoid of any showing of jurisdiction necessary to allow this court to enter any default judgment against CERN.[7]  Because Plaintiffs have failed to overcome the presumption that this Court lacks jurisdiction over CERN or Plaintiffs' claims against CERN, this Court should dismiss CERN from this litigation in accordance with In re Tuli, as noted above.[8]

---

[7] The Supreme Court has held that while "jurisdictional questions ordinarily must precede merits determinations in dispositional order . . . there is no mandatory 'sequencing of jurisdictional issues' . . . [and] a court may dismiss for lack of personal jurisdiction without first establishing subject-matter jurisdiction." Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 127 S.Ct. 1184, 1191 (2007) (quoting and citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 578, 584 (1999)).

[8] Plaintiffs do offer a defensive *forum non conveniens* argument with many unsubstantiated factual assertions about whether CERN may be sued for the LHC

(continued...)

Moreover, Federal Defendants' June 24, 2008 motion to dismiss and memorandum in support demonstrate that Plaintiffs lack standing to pursue their NEPA challenges against the LHC.  See Dkt. Nos. 14-15.  Because this Court must determine that it has jurisdiction over this case before it can enter a default judgment against CERN, and standing is jurisdictional, Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 86 (1998), this Court should resolve Federal Defendants' motion to dismiss before entertaining Plaintiffs' request for a default judgment against CERN.  If the Court determines that Plaintiffs do not have standing, this case must be dismissed pursuant to Federal Rule of Civil Procedure 12(h)(3), and Plaintiffs' motion for a default judgment will be moot.

Because this Court does not have jurisdiction over this case, CERN, or Plaintiffs' NEPA claims against CERN, Plaintiffs' request for a default judgment is not appropriate.  The Court should therefore dismiss this case for lack of

---

[8]/(...continued)
Project in Europe.  Pls. Mem. at 4-6.  The *forum non conveniens* doctrine is "a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined," pursuant to which the defendant bears the burden of persuasion. Sinochem, 127 S.Ct. at 1190 (quotation omitted).  Because CERN has not been properly served and has not made an appearance and argued *forum non conveniens*, Plaintiffs' arguments concerning *forum non conveniens* is premature and irrelevant. As with jurisdiction, however, Plaintiffs have identified no statute or other legal authority that provides that the District of Hawaii is the proper venue for Plaintiffs' NEPA claims against CERN.

jurisdiction, and should deny Plaintiffs' Motion.

**B.    A Default Judgment Against CERN Is Not Appropriate Because Plaintiffs' NEPA Claims Are Inextricably Linked To Federal Defendants**

In Frow v. De La Vega, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), the

Supreme Court held that under certain circumstances, a federal court should not

enter a default judgment against one or more defendants which is, or likely to be,

inconsistent with judgment on the merits in favor of the remaining answering

defendants.  The Ninth Circuit has applied the Frow principle to reverse a district

court's entry of a default judgment that was inconsistent with an earlier ruling

against answering defendants.  In re: First T.D. & Investment, Inc., 253 F.3d 520,

532-33 (9th Cir. 2001); see also Gulf Coast Fans, Inc. v. Midwest Elecs. Imps.,

Inc., 740 F.2d 1499, 1512 (11th Cir. 1984) (applying Frow to defendants who were

similarly situated).

Here, even assuming that this Court somehow has jurisdiction over CERN

and Plaintiffs' NEPA claims against CERN, Plaintiffs can sustain no claim against

CERN in the absence of Federal Defendants.  The operative provision of NEPA

provides that "all agencies of the *Federal* Government shall" prepare a detailed

environmental impact statement ("EIS") for "major *Federal* actions significantly

affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C) (emphasis

- 19 -

added).  Thus, on its face, NEPA imposes a legal requirement only on Federal agencies and only with regard to projects that are properly identified as Federal projects.  Therefore, if Plaintiffs have any claim against CERN that claim would exist solely because of the involvement of the Federal Defendants in the LHC Project.  Because CERN is not an "agenc[y] of the Federal Government," it could have no independent obligation to comply with NEPA.

Under these circumstances, then, it would be entirely inappropriate, prejudicial, and highly irregular for Plaintiffs to obtain a judgment, by default or otherwise, in the absence of a judgment against the Federal Defendants.  Because Federal Defendants have appeared and are defending this litigation, Plaintiffs must seek and obtain a judgment on the merits that Federal Defendants violated NEPA before this Court could even consider whether derivative relief against CERN is available or appropriate.  Conversely, if Federal Defendants prevail on their defenses against Plaintiffs' NEPA claims, there is no basis for any relief against CERN.  Therefore, on this basis alone, Plaintiffs' motion for a default judgment against CERN must be rejected in accordance with Frow.

Plaintiffs' proposed form of order for the default judgment, Dkt. No. 28, amply demonstrates the prejudice that Federal Defendants would suffer if a default judgment were entered against CERN.  The proposed findings of fact and

- 20 -

conclusions of law in Plaintiffs' proposed form of order include:

1.     Defendant CERN is engaged in ongoing business with it partner, the government defendants . . .

2.     Defendant CERN and the government defendants have an ongoing partnership Agreement whereby the government defendants . . . participate in the major decisions of the LHC with an equal voice of the other members.

3.     Neither Defendant CERN nor the government defendants have engaged in any form of hearings . . . so as to comply with the requirements [of NEPA] . . .

4.     The LHC project jointly developed by defendant CERN and the government defendants has identified high-risk adverse scenarios . . .

6.     The proposal to create stranglets ignores the risk that a strangelet, according to many credible theories, would be capable of engaging in a non-stop fusion reaction in which it would eventually fuse all of the normal atoms of earth [and all life on earth] to itself, converting the earth into one large strange atom . . .

Judgment by Default . . . Defendant CERN is obligated under NEPA . . . to provide plaintiffs with either an EIS, or a FONSI EA . . .
Accordingly it is ordered that . . . [a] permanent injunction is issued enjoining defendant CERN from operating the LHC . . .

Dkt. No. 28 at 1-7.

Plainly, an order adopting any of these provisions, as well as all the other provisions of the proposed order, would prejudice Federal Defendants. Each provision directly or indirectly implicates and applies to Federal Defendants and impairs the United States' interest in and use of the LHC. Each provision makes

findings of facts and/or conclusions of law that Federal Defendants dispute and that are contrary to the evidence already before the Court, prior to any resolution of Plaintiffs' claims against Federal Defendants.

And, because Federal Defendants would be ultimately responsible for any compliance with NEPA, even just ordering CERN to go through the NEPA process would be no different than ordering Federal Defendants to go through the NEPA process.  Any relief against CERN on a default judgment is prejudicial to the United States and inconsistent with a subsequent judgment in favor of Federal Defendants. Therefore, Plaintiffs' motion for a default judgment against CERN must be rejected.

## C.    The Factors For Awarding A Default Judgment Weigh Heavily Against Plaintiffs In This Case

"[J]udgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits."  <u>Falk v. Allen</u>, 739 F.2d 461, 463 (9th Cir. 1984).  The Ninth Circuit has identified seven factors that federal district courts should consider in determining whether to award a default judgment:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Even in the absence of all of the issues addressed throughout this brief, these seven factors dictate that Plaintiffs' request for a default judgment against CERN should be denied.

For instance, there is no possibility of prejudice to Plaintiffs because they have not demonstrated that any default judgment would be effective against CERN. Plaintiffs' "substantive claim" against CERN (or Federal Defendants) is weak because CERN is not a Federal agency under NEPA, and the LHC Project is on foreign land and under the control of a foreign international organization, with only minimal involvement from the United States.  Plaintiffs' Complaint is incredibly weak, as it fails to identify any basis for this Court's jurisdiction.  The sum of money at stake in this case is enormous:  a more than $500-million project, with the United States losing $10 million per month if the project is shut down.

There is a great dispute as to material fact (although Plaintiffs' evidence of those facts is not competent), as Federal Defendants have already demonstrated in this proceeding.  As discussed above, the default was improperly entered because Plaintiffs have failed to properly serve CERN.  And, finally, the "strong policy" favoring a decision on the merits is at its fullest force here because the Federal Defendants have not defaulted and are vigorously defending this lawsuit.

Therefore, not one of the seven factors weighs in favor of a default judgment.

- 23 -

Federal Defendants have and will continue to raise meritorious defenses in this matter, and will be severely prejudiced if a default judgment against CERN is entered.  This Court should deny Plaintiffs' motion for a default judgment against CERN.

## III.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE COURT SHOULD ISSUE A PERMANENT INJUNCTION AGAINST CERN

An injunction is an "extraordinary remedy" that "should issue only where the intervention of a court of equity 'is essential in order effectually to protect . . . against injuries otherwise irremediable.'"  Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) (citations omitted).  An injunction "is not a remedy which issues as a matter of course."  Id. at 311 (citation omitted).   "The requirements for the issuance of a permanent injunction are 'the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law.'"  American-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045, 1066-67 (9th Cir. 1995).

### A.   Any Claim For Injunctive Relief In This Case Is Barred By Application Of The Doctrine Of Laches

"To establish the doctrine of laches as an affirmative defense, the party seeking to invoke the doctrine must show:  (1) that the opposing party lacked diligence in pursuing its claim; and (2) that prejudice resulted from that lack of diligence."  Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372,

1381 (9th Cir. 1998) (citation omitted).  Ordinarily, the doctrine of laches "is to be

invoked sparingly in environmental cases because the plaintiff is not the only party

to suffer harm by alleged environmental damage."  Id.  This, however, is not the

ordinary case.  On the one hand, Plaintiffs' claim of environmental damage is

extraordinarily weak and based on incompetent and highly speculative evidence, as

demonstrated in other sections of this brief.  On the other hand, the LHC is a $500-

billion dollar project that, besides the tremendous financial concerns, implicates not

only international foreign policy considerations, but also stands at the forefront of

human-kind's development of a fundamental understanding of the origins of the

universe.

     An injunction against the LHC project would issue with devastating effect.

Plaintiffs had already mounted two failed legal challenges in 1999 and 2000 against

the last collider built.  See Wagner v. U.S. Dep't of Energy, Case No. C99-2226

MMC (N.D. Cal. 1999); Wagner v. Brookhaven Assocs., Case No. 00-CV-1672

(JG) (E.D.N.Y. 2000).  Although LHC has been in the construction phase for more

that 10 years, Plaintiffs waited until the $500-billion LHC was nearly fully

constructed and ready to begin operations before filing suit.

     The Ninth Circuit has held that "an EIS is required at the point when a federal

agency makes an irreversible and irretrievable commitment of the availability of

resources." <u>Friends of Southeast's Future v. Morrison</u>, 153 F.3d 1059, 1063 (9th

Cir. 1998).  Because NSF and DOE make their financial commitments to the LHC

project in 1999 and 1998, respectively, Plaintiffs could have brought their NEPA

claims against Federal Defendants 10 years ago.  Instead, Plaintiffs waited for 10

years to bring this case, to the obvious detriment and undue prejudice of Federal

Defendants and CERN, which had nearly completed construction of the $500-billion

project.  Plaintiffs' extraordinary lack of due diligence, and the degree of prejudice

to the defendants, far exceeds the circumstances in a case in which the Ninth Circuit

did apply laches to bar claims.   See <u>Apache Survival Coalition v. United States</u>, 21

F.3d 895, 907-14 (9th Cir. 1994) (holding that plaintiffs' claims were barred under

the doctrine of laches where plaintiffs sat on their legal claims for seven years, while

allowing a telescope construction project to move forward to 35-percent completion

and a total expenditure of almost $4 million).  Plaintiffs' claims for injunctive relief

should be barred under the doctrine of laches.

> **B.    Plaintiffs Cannot Demonstrate Irreparable Injury Because They Have Not Produced Any Credible Evidence Or Expert Opinions Supporting Their Doomsday Scenario**

The party seeking an injunction "must demonstrate a significant threat of

irreparable injury, irrespective of the magnitude of the injury." <u>Big Country Foods,</u>

<u>Inc. v. Board of Educ. of Anchorage Sch. Dist.</u>, 868 F.2d 1085, 1088 (9th Cir.

1989) (citations omitted); see also Goldie's Bookstore, Inc. v. Superior Court, 739

F.2d 466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable

injury."). Federal Defendants have already demonstrated in their motion to dismiss

that Plaintiffs' allegations that operation of the LHC threatens to destroy the planet

are unfounded and without scientific support. See Federal Defendants' June 24,

2008 "Memorandum In Support Of Combined Motion To Dismiss And Motion For

Summary Judgment," Dkt. No. 15 at 13-19; id. at 13 ("Plaintiffs' hypothetical,

scientifically unfounded doomsday proclamation does not allege any credible

injury.").

    Federal Defendants' showing that Plaintiffs' claims of injury were unfounded

was based on extensive declarations from two highly qualified and respected experts

in the field of high-energy nuclear physics, Dr. Morris Pripstein and Dr. Bruce

Strauss. See June 25, 2008 Pripstein Decl., Dkt. No. 19 ¶¶ 12-20 (refuting

Plaintiffs' assertions that the LHC might create dangerous micro black holes,

strangelets, and magnetic monoples); June 24, 2008 Strauss Decl., Dkt. No. 20

¶¶ 28-46 (same). These conclusions by Drs. Pripstein and Strauss were, in turn,

based on analyses by numerous other experts in the field of high energy nuclear

physics, including those physicists who authored and reviewed the safety reports for

the LHC and the Relativistic Heavy Ion Collider ("RHIC") in New York. See

- 27 -

Strauss Decl., Attchs. 13, 14, 15.  The consensus of these many experts is that operation of the LHC does not pose *any* threat to the existence of the world.

Plaintiffs, on the other hand, have not submitted any competent expert declarations in support of their exotic positions.  In considering the admissibility of expert evidence, this Court must ensure that the evidence is reliable and relevant. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  F.R.E. 702.  Local Rule 7.6 states that "[a]ffidavits and declarations [relating to *any* motion] shall contain only facts, shall conform to the requirements of Fed. R. Civ. P. 56(e) and 28 U.S.C. § 1746, and shall avoid conclusions and argument."  Federal Rule of Civil Procedure 56(e), in turn, requires that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).

- 28 -

"Affidavits and declarations not in compliance with this rule may be disregarded by the court."  Local Rule 7.6.

None of Plaintiffs' declarants, including Mr. Wagner and Mr. Sancho, have produced evidence that would qualify them as experts who are competent to provide scientific opinions in the field of high energy nuclear physics.  Such expertise is necessary to evaluate or predict the possible results of nuclear collisions at the LHC "which require competency in the field of High Energy Physics, not Health Physics or Nuclear Medicine."  August 29, 2008 Strauss Decl., Dkt. No. 66 ¶ 10.

> Practicing high energy physicists most typically possess a Ph.D or equivalent that requires at least four years and typically seven years to complete beyond the Bachelors degree.  A detailed research thesis is required for the Ph.D.  Most physicists take additional training beyond the Ph.D.  As a result of this extensive training they are able and qualified to analyze data from experiments.

Id.

Mr. Sancho states that he is a "System Scientist specialized in Cosmology and Time Theory," with an undergraduate degree from Barcelona University and that he "followed with my post-graduate studies at Columbia University, New York.  Dkt. No. 1, Attch. 1 (March 31, 2008 "Affidavit of Luis Sancho in Support of TRO and Preliminary Injunction") ¶ 1.  Mr. Sancho, who has not provided a *curriculum vitae* or a list of publications, does not claim to have any advanced degree in any

- 29 -

discipline of physics (or any other field) or to have published any physics-related articles in peer-reviewed scientific journals.  Mr. Sancho plainly is not qualified to provide reliable expert opinions relating to high energy nuclear physics or the potential results of LHC experiments.  In accordance with Local Rule 7.6, the Court should therefore disregard Mr. Sancho's declarations in this matter:  Dkt. No. 1, Attch. 1; Dkt. No. 55 ("Affidavit of Luis Sancho in Support of Opposition to 'Combined Motion to Dismiss and for Summary Judgment'") and attachments thereto.

Mr. Wagner claims to be a "nuclear scientist," but his undergraduate degree from Berkeley is in "biological sciences" with a minor in physics.  Dkt. No. 1, Attch. 3 (March 31, 2008 "Affidavit of Walter L. Wagner in Support of TRO and Preliminary Injunction") ¶ 1.  Mr. Wagner does not state that he has any other advanced degree in the sciences, other than a "graduate degree in 1978 in Sacramento, California *in law*."  id. (emphasis added).[9]

Like Mr. Sancho, Mr. Wagner has not attached a *curriculum vitae* to any of his declarations, nor has he provided a list of publications.  He also does not identify any peer-reviewed physics-related articles that he has published in scientific

---

[9] Because he does not identify any other advanced degrees, it is apparently on the basis his law degree that he holds himself out as "Dr. Walter L. Wagner," both before this Court and in other forums.

journals, although he claims to have *read* "tens of thousands of science articles from peer-reviewed publications in physics." August 5, 2008 Wagner Decl., Dkt. No. 30 ¶ 3. Mr. Wagner does assert that "[c]ommencing in 1973 [he] worked extensively in cosmic ray research" at Berkeley, Dkt. No. 1, Attch. 3 ¶ 2, that "resulted in the announcement of the discovery of a magnetic monopole in peer-reviewed publications, and which discovery has neither been refuted, nor re-confirmed by additional discovery." Dkt. No. 30 ¶ 2. Although Mr. Wagner does not specifically identify these "peer-reviewed publications," Dr. Strauss located a 1975 paper by P.B. Price, *et al.*, discussing magnetic monopoles, of which Mr. Wagner is not an author but is recognized by the authors in the acknowledgments section along with four other people whom the authors "thank for assistance." August 29, 2008 Strauss Decl., Dkt. No. 66 ¶ 6 and Attch. 1. This alleged discovery of a magnetic monopole as announced in the 1975 Price paper was quickly challenged by others, id. ¶ 7 and Attchs. 2-6, and in 1978 P.B. Price, et al., published a lengthy retraction paper that identifies Mr. Wagner as the "technician" who made the "erroneous indentification." Id. ¶ 8 and Attch. 7. Although Mr. Wagner states that he "conducted cosmic ray physic experiments at US Berkeley which resulted in numerous peer-reviewed publications," Dkt. No. 30 ¶ 3, a search by Dr. Strauss of the two principal public scientific data bases for materials dating back to the early 1970s did not turn up Mr.

Wagner as the author of any paper published in a reputable peer-reviewed journal in any endeavor.  Dkt. No. 66 ¶ 9.

Mr. Wagner states that he was a "Radiation Safety Officer" for the Veterans Administration "beginning in 1979," that he taught science "at various colleges and grade schools," remains "active in astrophysics and cosmology research," and that he "continue[s] membership in Health Physics society and Society of Nuclear Medicine."  Dkt. No. 30 ¶ 3.[10]  Mr. Wagner does not account for large gaps of time in his declarations.

The materials submitted by Mr. Wagner do not establish that Mr. Wagner is qualified pursuant to Federal Rule of Evidence 702 as an expert in high energy nuclear physics able to provide reliable scientific opinions on whether LHC experiments pose any risk of creating dangerous subatomic particles.  Mr. Wagner possesses only an undergraduate degree in biology (with a physics minor), no advanced degrees in physics or any other scientific discipline, and no publications as an author in any peer-reviewed scientific journals.  He also does not identify any work experience directly related to nuclear research colliders.  Mr. Wagner has not established that he is competent, as required by Federal Rule of Civil Procedure

---

[10] Mr. Wagner apparently is not an active member of either society.  See August 29, 2008 Straus Decl., Dkt. No. 66 ¶ 9.

56(e), to testify credibly on the highly-technical high energy nuclear physics issues

that are the subject of his many declarations and necessary for the opinions in those

declarations.  Nor has he demonstrated that his methodologies are reliable or based

on sound scientific principles.  Therefore, the Court should disregard the following

of Mr. Wagner's declarations in accordance with Local Rule 7.6:  Dkt. No. 1, Attch.

3; Dkt. No. 30; Dkt. No. 46 ("Affidavit of Walter L. Wagner in Support of

Opposition to 'Motion for Leave to File Brief Amicus Curiae'") and attachments

thereto; Dkt. No. 54 ("Affidavit of Walter L. Wagner in Support of Opposition to

'Combined Motion to Dismiss and for Summary Judgment'") and attachments

thereto; Dkt. No. 67 ("Affidavit of Walter L. Wagner in Support of Opposition to

'Combined Motion to Dismiss and for Summary Judgment'") and attachments

thereto.[11]

   The only sections in Plaintiffs' memorandum in support of their motion for an

---

[11] Plaintiffs' other "expert" declarants are uniformly lacking in relevant experience, training, and expertise to qualify as experts on high energy nuclear physics matters, and none has produced a *curriculum vitae* or publications list.  Their declarations should be disregarded by the Court as well.  See Dkt. No. 1, Attch. 2 (Affidavit of Richard J. Wagner, undergraduate degree in mechanical engineering, master's degree in computer science, and doctorate in robotics and artificial intelligence); Dkt. No. 1, Attch. 4 (Affidavit of Mark Leggett, risk assessment);  Dkt. No. 1, Attch. 5 (Affidavit of Rodney J. Skinner, health and safety risk assessment); Dkt. No. 1, Attch. 6 (Affidavit of Paul W. Dixon, Professor of Psychology and Linguistics); Dkt. No. 1, Attch. 7 (Affidavit of James R. Blodgett, master's degrees in biometry and statistics, business administration, and sociology).

- 33 -

injunction against CERN that arguably address a claim of irreparable injury do not

contain a single citation for any of the many factual allegations.  See Pls. Mem.,

Dkt. No. 31 at 8-10 ¶¶ 4-10.  Even if these allegations were supported by citations

to competent evidence, they are plainly spurious.  For instance, Plaintiffs assert that

the June 20, 2008 LHC Safety Assessment Group ("LSAG") Report identifies

"high-risk adverse scenarios" for LHC.  Id. at 8 ¶ 4.  On the contrary, after a

detailed analysis based on published literature and empirical evidence, the LSAG

Report team of experts conclude just the opposite, that there were no credible

scenarios that posed any risk:  "There is no basis for any concerns about the

consequences of new particles or forms of matter that could possibly be produced

by the LHC."  June 24, 2008 Strauss Decl. ¶ 31 (quoting LSAG Report, Attch. 15 at

14).  And, contrary to Plaintiffs' unsubstantiated claims that the 2008 LSAG Report

contains flaws, is biased, or supports Plaintiffs' positions, Pls. Mem. at 10 ¶¶ 8-10,

the LSAG Report has been independently reviewed by the highest-caliber physicists

in the scientific community, has been found to be robust and endorsed, and firmly

rejects Plaintiffs' "purely hypothetical occurrences" and "unconventional theories" as

baseless. E.g., June 24, 2008 Strauss Decl., Dkt. No. 20 ¶¶ 32, 34, 40; see also

August 29, 2008 Strauss Decl., Dkt. No. 66 ¶¶ 15-26.  See also September 5, 2008

Strauss Decl., filed herewith, ¶ 3 (reporting that the 2008 LSAG Report has now

been accepted and published in a peer-reviewed scholarly physics journal).

Plaintiffs have fallen far short of meeting their heavy burden of demonstrating irreparable injury.  Plaintiffs have produced no competent evidence indicating that the LHC may harm them or the planet, and even if Plaintiffs' evidence and "expert" opinions were competent, they have been thoroughly reviewed and debunked by some of the top physics experts in the world.[12]

## C.    The Balance Of Harms And Public Interest Weigh Against An Injunction

In contrast to Plaintiffs' failure and inability to demonstrate irreparable injury, the balance of harms and public interest weigh heavily against the grant of an injunction in this matter.  Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  Weinberger, 456 U.S. at 312; see also Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152, 1157-58 (9th Cir. 1988) (reversing district court for issuing injunction without

---

[12] See Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency & Office of Emergency Preparedness, 649 F.2d 71, 74-75 (1st Cir. 1981) (holding that the specter of nuclear accident or attack by enemy power insufficient to constitute immediate irreparable harm); Crowther v. Seaborg, 415 F.2d 437, 438-39 (10th Cir. 1969) (finding no irreparable harm where there was  no evidence that research project to study feasability of using underground nuclear devices to generate natural gas was reasonably probable or reasonably likely to cause accident); Chemical Weapons Working Group, Inc. v. U.S. Dept. of the Army, 963 F. Supp. 1083, 1095-97 (D. Utah 1997) (holding no irreparable injury where asserted risks of operation of facility for incineration of chemical warfare agents not likely).

considering public interest and "balancing the equities" on an "inadequate record").

If CERN's operation of the LHC were enjoined, DOE's Office of High Energy

Physics estimates that the cost to the United States would be approximately

$10,000,000 per month of inactivity.  June 24, 2008 Strauss Decl., Dkt. No. 20

¶ 27.  Moreover, enjoining CERN and its 20 European member states from

operating a project in which they had invested more than $5 billion to construct,

would plainly raise foreign policy issues and strain in the international community,

and such tensions could jeopardize the United States' $531-million investment in the

project.  Id.  This would, in turn, if it led to the United States being excluded from

using the LHC facilities for even a short time, result in the United States' missing out

on the benefits of the project, because the LHC is expected to deliver important

scientific discoveries very soon after its initial startup.

These costs to the United States, in terms of tens of millions of dollars,

tension with foreign sovereigns created by a United States' injunction, and the lost

opportunities for advancement of scientific knowledge for the United States, plainly

outweigh Plaintiffs' highly speculative and unsubstantiated claims that the LHC

Project poses a risk to the entire planet.  In Amoco Production Co. v. Village of

Gambell, 480 U.S. 531, 545 (1987), the Supreme Court found that a potential loss

of a $70 million investment in oil exploration should an injunction have issued

outweighed any harm to the environment that was "not at all probable."  <u>See also</u>

<u>Half Moon Bay Fisherman's Marketing Assn. v. Carlucci</u>, 857 F.2d 505, 513-14

(9th Cir. 1988) (economic loss to city, even though amount was speculative,

outweighed plaintiffs' lack of evidence concerning effects of harbor dredging on fish

and crab populations or their potential recovery).  Despite Plaintiffs' doomsday

scenarios, the balance of harms and the public interest factors plainly weigh heavily

against the entry of an injunction against CERN.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for a default judgment and

injunction against CERN is without merit and should be denied.

Dated this 5th day of September 2008.

Respectfully submitted,

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawaii
DERRICK K. WATSON
(Cal. Bar #154427)
Assistant United States Attorney
District of Hawaii

RONALD J. TENPAS
Assistant Attorney General
Env't & Natural Resources Div.

- 37 -

   /s/ Andrew A. Smith

ANDREW A. SMITH (N.M. Bar #8341)
Trial Attorney
Natural Resources Section
Env't & Natural Resources Div.
United States Department of Justice

*Of Counsel*:

CAROLINE M. BLANCO
Assistant General Counsel
Office of the General Counsel
National Science Foundation
Arlington, VA

STEVE DOVE
Attorney
Office of the General Counsel
U.S. Department of Energy
Washington, D.C.

                    Attorneys for Federal Defendants
U.S. Department of Energy and
National Science Foundation

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.5

Pursuant to LR 7.5(e), I hereby certify that this brief contains 8688 words, not counting the case caption, table of contents, table of authorities, signature block, certificate of compliance with Local Rule 7.5, or the certificate of service.  I further state that I relied upon WordPerfect word processing software to obtain the foregoing word count.

Dated:  September 5, 2008          /s/ Andrew A. Smith
                                   ANDREW A. SMITH
                                   Trial Attorney
                                   United States Department of Justice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 5, 2008, true and correct copies of the foregoing were served on the following individuals by United States mail, first class postage prepaid:

LUIS SANCHO
P.O. Box 411
Honomu, Hawaii 96728

WALTER L. WAGNER
P.O. Box 881
Pepeekeo, Hawaii 96783


 /s/ Andrew A. Smith_____
ANDREW A. SMITH
United States Department of Justice